# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1166
_____

United States of America

*Plaintiff - Appellee*

v.

Laguerre Payen

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Springfield
_____

Submitted: January 16, 2025
Filed: July 18, 2025
_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.
_____

LOKEN, Circuit Judge.

Laguerre Payen, a federal inmate whose sentence was about to expire, appeals the district court[1] order under 18 U.S.C. § 4246 committing him to the custody of the

_____

[1]The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri, adopting the report and recommendation of the Honorable Willie J. Epps, Jr., Chief United States Magistrate Judge for the Western District of Missouri.

Attorney General for involuntary hospitalization. After holding the hearing required by § 4246(c), the court found "by clear and convincing evidence that [Payen] is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." § 4246(d). Payen argues the district court erred because it relied on erroneous facts and the government failed to prove by clear and convincing evidence that his release would cause a substantial risk of bodily injury or serious damage to property. Reviewing the district court's finding of dangerousness for clear error, we affirm. See United States v. Steil, 916 F.2d 485, 487-88 (8th Cir.1990) (standard of review) (citations omitted).[2]

## I. Background

In October 2010, a Southern District of New York jury convicted Payen, a native of Haiti, of conspiracy to use weapons of mass destruction, attempting to use weapons of mass destruction, conspiracy to acquire and use anti-aircraft missiles, attempting to acquire and use anti-aircraft missiles, and conspiracy to kill officers and employees of the United States. In 2011, the district court sentenced Payen to the mandatory minimum 25 years imprisonment.

By 2015, Payen had an extensive history of disruptive, dangerous, and assaultive behavior in prison, committing dozens of Bureau of Prisons (BOP) violations, many for assault, threatening bodily harm, destroying property, possessing a dangerous weapon, and sexual misconduct. He was transferred to the United States Penitentiary in Tucson, Arizona, where he was uncooperative, unwilling to take medication, catatonic, and unable to attend to his hygiene. In February 2016, he was

---

[2]For decades, this court and other circuits have used the term finding of dangerousness "to refer to the . . . statute's somewhat awkwardly phrased double-negative [substantial risk] standard." United States v. Gilgert, 314 F.3d 506, 512 n.3 (10th Cir. 2002). It is the statutory standard that of course must be satisfied.

transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri (USMCFP) for a mental health assessment. There, he was sexually inappropriate to female staff, aggressive, confused, psychotic, and suicidal. Payen objected to inpatient treatment. Clinical Psychologist Elizabeth Tyner diagnosed him with schizophrenia and mild intellectual disability and requested commitment proceedings under 18 U.S.C. § 4245.[3] The district court for the Western District of Missouri granted the government's motion and involuntarily committed Payen for hospital care and treatment. Payen's behavior improved, and the district court terminated § 4245 commitment in October 2017.

After his commitment terminated, Payen refused continued psychiatric medication. He became psychotic and delusional, unresponsive, unhygienic, and made sexually suggestive gestures to a nurse. USMCFP psychiatry services determined that "involuntary administration of medication remains necessary." On March 5, 2018, the district court granted the government's second § 4245 petition.

In December 2019, Payen arrived at USMCFP's Transitional Care Unit, where he was counseled numerous times, cited for stalking, and twice found guilty of inappropriate sexual behavior. From March to August of 2021, he declined most treatment, became defensive, rude, swore at staff, and engaged in rule-breaking behavior such as being in another inmate's cell and possessing pornography. His health and behavior significantly improved in 2022 and 2023, but he was inconsistent

---

[3]Section 4245 provides that "[i]f a person serving a sentence of imprisonment objects . . . to being transferred to a suitable facility for care or treatment, . . . the Government, at the request of the director of the facility in which the person is imprisoned, may file a motion with the court . . . in which the facility is located for a hearing on the present mental condition of the person. The court shall grant the motion if there is reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility."

in adhering to appropriate boundaries and rules and had little insight regarding past commitment and mental health treatment. He remained committed until the end of incarceration in 2023.

In July 2023, the Southern District of New York, ruling on Payen's 18 U.S.C. § 3582(c)(1)(A)(i) compassionate release motion, reduced his sentence to time served plus 90 days. United States v. Williams, No. 09 CR 558 (CM), 2023 WL 4785286, at *1 (S.D.N.Y. July 27, 2023) (Williams Order). The Decision stated that "Payen . . . should not be released from custody without being immediately transferred to some sort of supportive housing in order to deal with his mental health issues."

On August 31, in anticipation of his release, Payen was transferred to USMCFP to undergo a risk assessment to determine whether he was suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury or serious damage to property of another, warranting commitment and continuing custody. See § 4247(b).

The USMCFP Risk Assessment Panel (Panel), consisting of Tyner and Forensic Postdoctoral Fellow Katlyn Hanson, thoroughly analyzed historical, clinical, and risk management factors and recommended commitment, opining in a 19-page Forensic Psychological Risk Assessment Report that Payen "currently suffers from a mental disease," specifically schizophrenia and intellectual disability, and that, if he were released, there would be a "substantial risk of bodily injury to another person or serious damage to the property of another" (Panel Report).

The government then filed in the Western District of Missouri a § 4246 Petition To Determine Present Mental Condition of an Imprisoned Person, submitting the Panel Report, a Certificate of Mental Disease or Defect and Dangerousness from the USMCFP Warden, conviction and sentencing records from the Southern District of New York, and documents showing that suitable arrangements for state custody and

care of Payen had been sought but were unavailable. The court granted a motion by Payen's counsel for an independent psychological evaluation. Like the Panel, the independent evaluator, Licensed Psychologist Shawna Baron, recommended commitment, opining that Payen suffers from schizophrenia and mild intellectual developmental disorder and that "[h]is risk for re-offense is directly related to his mental illness (e.g., disorganization, delusions, paranoia) and leaves him at substantial risk for harm to himself, others, and property at this time."

Magistrate Judge Epps held a brief hearing. See § 4246(c). Payen admitted he has "some type of mental disease" and testified he would continue to follow his doctor's treatment instructions and did not believe he would pose a danger to himself, other people, or their property if released. Relying on the Panel Report, Dr. Baron's report, and Payen's testimony, Judge Epps determined that there is clear and convincing evidence "of a substantial risk to others or their property if Mr. Payen were released" and recommended that the district judge "enter an order committing [Payen] to the custody of the Attorney General in accordance with the provisions of [§ 4246]." See 28 U.S.C. § 636(b). Payen filed a general objection to the magistrate judge's report and recommendation. On January 9, 2024, the district court adopted the findings and recommendation of Magistrate Judge Epps, noting that "[t]he experts agree that [Payen] suffers from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." The court ordered Payen committed under § 4246. This appeal followed.

## II. Discussion

Section 4246 provides for the commitment of a person whose sentence is about to expire, and who, because of a mental disease or defect, poses a substantial danger to the public. See United States v. Thomas, 949 F.3d 1120, 1123 (8th Cir. 2020). Our statement of what the government must prove by clear and convincing evidence

to warrant commitment has varied somewhat over the years but was accurately summarized in United States v. Dalasta, 3 F.4th 1121, 1125 (8th Cir. 2021):

> [T]he statute requires the government to prove that the person (1) has a mental disease or defect and (2) will be dangerous ("would create a substantial risk of bodily injury or serious property damage") if released. In addition, the government must prove that there is "a direct causal nexus between the mental disease or defect and dangerousness" and that there is not a "suitable state placement."

(citations omitted.) Payen's appeal is limited to the second prong. He argues that (i) the government failed to meet its burden of proving dangerousness by clear and convincing evidence and (ii) the district court erred by failing to consider the totality of the circumstances surrounding Payen's BOP disciplinary record and strongly conflicting evidence, the Williams Order.

**A. Standard of Review.** We review the district court's finding of dangerousness for clear error, reversing only if we are left with "a definite and firm conviction that a mistake has been committed." Thomas, 949 F.3d at 1123 (quotation omitted). The government argues Payen failed to preserve the argument that the district court erred in not considering the Williams Order because he did not raise that order in the commitment proceedings. Payen responds that the government was responsible for failing to inform the court because it only attached the Southern District of New York's one-page order to its § 4246 Petition. We need not resolve this rather silly squabble. Neither counsel advised us that the Panel Report lists the Williams Order as one of its sources of information, meaning the district court knew the Williams Order had been considered by the Panel in finding that Payen "meets criteria for commitment under § 4246." The issue was adequately if imperfectly preserved.

-6-

**B. Was Dangerousness Proved by Clear and Convincing Evidence?**  As in other § 4246 appeals, we have little difficulty concluding that the district court's finding of dangerousness is supported by clear and convincing evidence -- the unanimous opinion of experts, including independent evaluator Dr. Baron, that Payen suffers from a mental illness or defect as a result of which his release would create a substantial risk of bodily injury or serious property damage to others; Payen's hearing testimony; and the other documents submitted with the § 4246(a) Petition. Cf. United States v. Lewis, 929 F.2d 440, 442 (8th Cir. 1991); United States v. S.A., 129 F.3d 995, 1000-01 (8th Cir. 1997), cert. denied, 523 U.S. 1011 (1998); Steil, 916 F.2d at 488.

In making its finding of dangerousness, the district court properly focused on the detailed Panel Report and Dr. Baron's independent report.  The Panel Report was prepared using observations and examinations, Payen's self-report, and a variety of records including reports prepared in anticipation of Payen's § 4245 commitments, the Williams Order, and BOP records.  The Panel Report discussed Payen's upbringing, noting he did not graduate high school, was diagnosed with intellectual disability, and began using illicit substances like crack, cocaine, and marijuana when he was 15 years old.  It then provided an overview of Payen's criminal history prior to the 2009 terrorism conviction:  he was charged with petit larceny and possession of marijuana at age 16; disorderly conduct at 17; attempted burglary and illegal entry at 18; and attempted assault and intent to cause physical injury with a weapon at 20 when he shot two persons with a BB gun.  The Panel outlined Payen's 150 incident code violations while in the BOP, noting that "[i]t appears that a significant portion of these violations involved assault or threatening bodily harm."  It reviewed Payen's prior mental health diagnoses, which included schizophrenia, unspecified psychosis, unspecified anxiety disorder, depressive disorder, intellectual disability, moderate intellectual disability, and antisocial personality disorder.

The Panel Report also recounted in detail Payen's dangerous behavior while in BOP custody. At USMCFP, he bit and spit on officers, defecated on the floor of his cell, was sexually inappropriate to female staff, aggressive, confused, psychotic, and suicidal. During the first several months of his second commitment, Payen denied psychotic thought processes, resisted medication, and continued to struggle with hygiene. His presentation and mood varied drastically; some days he was catatonic, disruptive, or aggressive. He exposed his genitals to a nurse and made sexually explicit comments and masturbated when the nurse confronted him about it. Since entering BOP custody in 2009, Payen has been committed twice due to extreme mental health and behavioral problems and cited for over 150 incident code violations ranging from non-violent offenses like refusing to obey an order to violent, disturbing offenses like assault resulting in serious injury, possessing a dangerous weapon, threatening bodily harm, and making sexual proposals and threats.

The Panel Report then discussed the risk assessment analysis the Panel conducted using the HCR-20-3, an instrument that looks to historical, clinical, and risk management variables to assess a person's future risk for violence, to predict Payen's risk of dangerous future behavior. The analysis explored historical risk factors -- Payen's history of violent criminal behavior before and during incarceration; his chronic mental illness, uncontrolled when he was not involuntarily medicated; his history of substance abuse and lack of stable employment. It examined clinical factors -- Payen's limited insight into his mental illness and need for treatment and an unwillingness to take medication "when left to his own devices both in the BOP and while in the community." Finally, it considered risk management factors -- he "does not have a sufficient proposed release plan. . . . There appears to be no family or friends that would be a capable source of support for Mr. Payen if he were to be released." Payen's "risk for violence only seems mitigated by . . . involuntary psychiatric medications and placement in a highly structured environment (such as . . . secured housing at USMCFP) . . . that is unlikely available to him in the community."

-8-

The Panel diagnosed Payen with schizophrenia and mild intellectual disability. The Panel Report concludes that "it is the opinion of the Risk Assessment reviewer that Mr. Payen . . . meets criteria for [§ 4246] commitment . . . and inpatient mental health treatment is recommended."

Dr. Baron's report, prepared at Payen's request, concurred with the Panel's assessment after interviewing and evaluating Payen and reviewing available records. While Payen was cooperative and well oriented during the evaluation, he "did not have a good understanding of his legal status or pending 4246 commitment, . . . [spoke] of irrelevant topics for extended periods of time, . . . exhibit[ed] suspiciousness regarding prison staff, . . . [and] seemed to have limited judgment and insight." Like the Panel, Dr. Baron discussed Payen's upbringing, criminal and substance abuse history, his 150 BOP violations, mental health struggles, and his time in the BOP. Dr. Baron diagnosed Payen with schizophrenia and mild intellectual developmental disorder. Using the HCR-20-3 to assess future risk for violence, Dr. Baron concluded that Payen is of "moderate to high risk for re-offense in terms of violent behavior" due to his violent history, lack of insight into his mental illness and need for treatment, difficulty functioning when unmedicated, and lack of a plan if released. Dr. Baron concluded that "there is no evidence to suggest Mr. Payen's mental status would improve, or even remain stable, if released to the community. . . . [H]e has never taken psychiatric medications voluntarily."

The district court thoroughly discussed the Panel and Dr. Baron's reports and Payen's testimony. Based on the expert opinions, and Payen's "lack of insight, history of violence in the community and while in BOP custody, and extensive history of severe mental illness," the district court found that the government presented clear and convincing evidence that Payen is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another and therefore commitment under § 4246 is appropriate. We find no clear error.

-9-

As noted, we have repeatedly upheld a district court's finding of dangerousness when experts, including an independent court-appointed expert, unanimously agree that the defendant is dangerous and the defendant fails to present conflicting medical or expert evidence. We have also upheld a court's dangerousness finding when, as in this case, the record reflects a long history of "violent and aggressive behavior and mental instability . . . an extensive history of drug and alcohol abuse . . . [and] a reluctance to continue medication on [one's] own." S.A., 129 F.3d at 1000-01; see also United States v. Ecker, 30 F.3d 966, 970-71, 970 n.7 (8th Cir. 1994). The record before us is littered with evidence suggesting a genuine possibility of harm to other persons or their property -- Payen's extensive history of violence, improper sexual behavior, severe mental health issues, lack of insight, multiple BOP violations, and the experts' multiple reports.

Payen contends the district court "clearly erred in failing to consider the totality of the circumstances surrounding Mr. Payen's BOP disciplinary record." Many violations are not described in detail and after 2020, his conduct drastically improved, with fewer and less serious violations. But many of the 150 violations -- assault *with threats of serious injury*, fighting another person, threatening bodily harm, possessing a dangerous weapon, stalking, and sexual threats -- suggest a likelihood of future dangerousness, particularly if Payen again fails to take or refuses anti-psychotic medications. "[O]vert acts of violence are not required for a dangerousness finding." United States v. Williams, 299 F.3d 673, 677 (8th Cir. 2002). And improved behavior, even if "coupled with a detainee's minimal history of actual violence," does not require a finding that a person presently in custody is not dangerous. Dalasta, 3 F.4th at 1125 (quotation omitted); see also S.A., 129 F.3d at 1001. "A finding of substantial risk under § 4246 may be based on any activity that evinces a genuine possibility of future harm to persons or property." Dalasta, 3 F.4th at 1125.

Payen also contends the district court failed to consider the full Williams Order, which in granting compassionate release contained "significant and persuasive

-10-

evidence that Mr. Payen, if released, would not pose a substantial risk of bodily injury to others." As noted, the Panel Report advised the district court that the Panel considered the full <u>Williams</u> Order and nonetheless concluded that Payen should be committed. This is hardly surprising. The <u>Williams</u> Order focused on Payen's *past* history and why the nature of his terrorism crime warranted a sentence reduction. It did not assess Payen's future risk of dangerousness upon his release. Instead, the New York court kept Payen in custody for 90 more days and cautioned that he "should not be released from custody without being immediately transferred to some sort of supportive housing in order to deal with his mental health issues." 2023 WL 4785286, at *14. On this record, the district court was not required to further consider or specifically address the <u>Williams</u> Order. The court properly focused on Payen's future dangerousness, not the circumstances surrounding his past dangerous conduct.

For the foregoing reasons, the judgment of the district court is affirmed.

_____